IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CT-3107-FL

| | | |
|---|---|---|
| OCTAVIOUS E. ELMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JOHN HERRING, DENNIS DANIELS, | ) | |
| and P. WOOD, | ) | |
| | ) | |
| Defendants. | ) | |

The matter is before the court on defendants' motion for summary judgment (DE 35) pursuant to Federal Rule of Civil Procedure 56(a). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' motion for summary judgment.

## STATEMENT OF THE CASE

On May 6, 2013, plaintiff, a state inmate and Muslim, brought this action *pro se* against defendants Maury Correctional Institution ("Maury") Administrator Dennis Daniels ("Daniels"), Maury Superintendent John Herring ("Herring"), and Maury Chaplain P. Wood ("Wood"). Plaintiff raised claims pursuant to 42 U.S.C. § 1983, alleging violations of his rights pursuant to the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment, and the Eighth Amendment. Plaintiff also alleged claims pursuant to the Religious Land Use of Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-1, et seq. These claims arose out of Maury's alleged blanket policy of strip searching

inmates who attend religious services and the amount of Islamic versus Christian materials in the chaplain's library. Plaintiff requested a declaratory judgment against defendants and injunctive relief ordering defendants to stop the use of strip searches, provide funding for Islamic materials, to approve a Halal diet, and allow congregational worship for Muslims daily. Plaintiff also requests monetary and punitive damages.

On February 4, 2015, defendants filed a motion for summary judgment, arguing that plaintiff is unable to establish a constitutional violation. Defendants, additionally, assert the affirmative defense of qualified immunity. In support of their motion, defendants provided the following: an affidavit from defendant Daniels; plaintiff's public access information sheet; DPS' religious practices manual information regarding Islam; plaintiff's February 20, 2013, grievance and subsequent responses; Maury's February 6, 2014, Islamic Inventory log; an Islamic materials invoice; plaintiff's personal property inventories; Maury's January 16, 2013, memorandum regarding searches; DPS' policy regarding searches; and plaintiff's religious services attendance log. Plaintiff responded to defendants' motion and provided the following supporting materials: plaintiff's declaration in opposition to defendants' motion; inmate statements and grievances; Maury's February 6, 2014, Islamic inventory log; Maury's Christian inventory log; and defendants' supplemental response to plaintiff's first request for production of documents.

## STATEMENT OF THE FACTS

Except where noted below, the undisputed facts are as follows. Plaintiff was transferred to Maury on November 21, 2012, and his complaint relates solely to policies and conditions pertaining to the practice of his Islamic faith at that institution. (Daniels Aff. ¶ 5.) On the date plaintiff was transferred to Maury, Maury prison officials conducted a personal property inventory and recorded

2

that plaintiff possessed the following religious items: (1) one religious rug; (2) sixteen oils; (3) one religious hat; and (4) five religious books. (Id. ¶ 12; Ex. F, p. 2.)

During the time period plaintiff was incarcerated at Maury, the institution experienced multiple occurrences of inmates assaulting other inmates on their way to, from, or even during chapel services. (Id. ¶ 18.) Such instances included inmate-on-inmate assaults using weapons or contraband. (Id.) Maury prison officials also noted that inmates were using chapel services as an opportunity to exchange contraband, including gang or security threat group materials. (Id.) Maury prison officials attributed the assaults and contraband exchanges to the unique opportunity chapel services provided inmates from each of the individual housing units, which typically remained segregated, to come into contact with one another. (Id. ¶ 20.) As a result, on January 16, 2013, defendant Herring circulated a memorandum to all shift officers in charge and to all unit management explaining a new procedure for beginning chapel services and for the conclusion of chapel services. (Id. ¶ 14; Ex. G.) The memorandum stated that the new procedure was effective immediately, and provided in pertinent part:

> Any inmate that leaves the housing unit for Chapel services will be completely searched (includes strip search) before returning to the housing unit. At the conclusion of the service, all inmates will be completely searched. The search site will be the staff restroom located adjacent to the Chapel in the hallway. The Shift OIC will be responsible to coordinate these activities with the Facility Chaplain and program staff.

(Id.)

Subsequent to the enactment of the policy, several Maury inmates filed grievances related to the new procedure. For instance, one inmate[1] complained that inmates attending Native American

---

[1] The inmate's name has been redacted from the grievance. See (Pl.'s Resp. Attach. p. 4.)

3

and Moorish Science religious services on January 22, 2013, were strip searched following their respective services, but that Christian inmates were not strip searched. (Pl.'s Resp. Attach. p. 4.) The inmate further alleged that inmates attending Muslim religious services the following day also were strip searched. (Id.) Another inmate also complained that Muslim inmates were strip searched most often, while Christian inmates were strip searched less frequently. (Id. p. 12.)

In addition to the January 2013, inmate grievances, plaintiff submitted his own grievance to Maury prison officials on February 20, 2013. (Id. Ex. C. p. 3; Compl. Attach. p. 3.) Plaintiff's grievance provided in pertinent part:

> For the past month, upon exiting my Islamic services, I'm routinely strip searched along with other muslim participants. This new rule that the administration (superintendents Herring and Daniels) has implemented isn't prevalent throughout N.C.D.P.S., nor does it justify legitimate penological interests. This is blatant, calculated, harassment. Unacceptable torment that will not be tolerated. These unacceptable measures are designed to keep brothers from worshiping their Lord. Attendance has lowered drastically. What sane believer encourages degradation, dehumanization, and humiliation because of something they believe in? Especially in front of individuals (officers) with questionable sexual preferences. Superintendent Herring and Daniel along with Chaplain Wood[] (Christ[]) knowingly deprive the muslims of their constitutionally protected rights. Muslims aren't allowed to attend holy feasts, our funds from Raleigh have been misappropriated, Chaplain Wood[] refuses to order us literature dvd, etc. There's only one Qu'ran in the chaplain library when there's hundreds of Bibles. Need I say more?

(Id.)

On February 26, 2013, prison officials responded to plaintiff's grievance and explained to plaintiff that "searches on inmates [could] be conducted at any point in time" and that the January 16, 2013, chapel procedures policy (applicable to all inmates) provided that an inmate leaving the

4

housing unit for chapel services would be completely searched (including strip searched) before returning to the housing unit. (Id. Ex. C, p. 2.) Prison officials further informed plaintiff that:

> Islamic inmates are afforded two religious feasts per year. Per memorandum from Raleigh, Islamic inmates must send a request to the chaplain to be eligible for the feasts. The Islamic inmates (and only Islamic inmates) who send the requests are put on the roster and allowed to attend the feasts. A good faith effort is being made to add to the Chaplain's Library, Islamic material that will enhance the Islamic portion of the library which already has many books and inventory.

(Id.)

As prison officials indicated in their February 26, 2013, response to plaintiff's grievance, defendant Wood took measures to add Islamic materials to the chaplain's library and ordered 10 additional copies of the Qu'ran. (Id. ¶ 11; Ex. E.) A few months later, on September 12, 2013, DPS Regional Chaplain Services visited Maury and indicated to Maury prison officials that the chapel had a sufficient amount of religious materials on hand and that religious services at Maury were being conducted in accordance with DPS policies and procedures. (Id. ¶ 13.)

On April 26, 2013, Maury prison officials conducted a second personal property inventory for plaintiff and recorded that plaintiff possessed the following religious material: (1) one Holy Bible; (2) one prayer rug; (3) two religious caps; (4) one set of prayer beads; and (5) one container for prayer beads. (Id. Ex. F. p. 5.) Defendant Wood also conducted an inventory of Islamic materials in the chaplain's library on February 6, 2014, which revealed that the library included 12 books, 46 compact discs, two cassettes, 10 video tapes, three dvds, and over 80 tracts. (Id. ¶ 10; Ex. D.) Maury records further reflect that plaintiff regularly attended Talim and Jumah religious services and attended the Eid Al Fitr and Eid Adha Feasts while he was incarcerated at Maury. (Id. ¶ 24; Ex. I.) Plaintiff was transferred from Maury to Franklin Correctional Center on April 29, 2014.

5

(Id. ¶ 5.) At some point subsequent to plaintiff's transfer from Maury, defendant Wood retired from employment with DPS. (Id. ¶ 8.)

**DISCUSSION**

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.    Analysis

    1.    Standing

Plaintiff, in his response to defendants' motion for summary judgment, asserts that other Maury inmates were harassed while being strip searched, were not permitted to check out books from the chaplain's library, were not permitted to copy religious materials, and were not permitted to purchase items related to their practice of Islam. In support of his claims, plaintiff presented witness statements and grievances. Plaintiff, however, lacks standing to bring a lawsuit on another inmate's behalf. See Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587, 598 (2007); Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 319-320 (4th Cir. 2002). Thus, to the

6

extent plaintiff seeks to bring a claim on behalf of other inmates, such claims are DISMISSED, and plaintiff's action is limited to plaintiff's own personal alleged constitutional violations.

2. RLUIPA and First Amendment

Plaintiff alleges claims pursuant to both RLUIPA and the First Amendment. Beginning with plaintiff's RLUIPA claim, RLUIPA provides, in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

7

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Ozmint, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472 F.3d at 198 n. 8).

As for plaintiff's First Amendment claim, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The United States Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safely, 482 U.S. 78, 89–91 (1987).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89–90.

8

Claims pursuant to the First Amendment and RLUIPA are evaluated under the same factors, but First Amendment claims are subject to a less demanding standard of proof. See Lovelace, 472 F.3d at 199, n.8 ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quoting Madison v. Ritter, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)).

        a.        Post-Chapel Search Policy

Defendants argue plaintiff is unable to establish a RLUIPA or First Amendment violation with respect to his challenge to Maury's post-chapel search policy because plaintiff cannot establish that the policy substantially burdened his practice of Islam. Although plaintiff asserts that other inmates have been deterred from attending religious services due to the post-chapel search policy, plaintiff has not alleged or submitted any evidence to reflect that he, himself, was forced to modify his behavior and, as a result, violated his religious beliefs. Instead, plaintiff's religious services attendance record reflects that plaintiff did, in fact, regularly attend Muslim religious services while at Maury. (Daniels Aff. ¶ 24 and Ex. I.)

Because plaintiff has failed to establish that the challenged policy substantially burdened the practice of his Islamic faith, plaintiff failed to establish a RLUIPA or First Amendment violation. See Cutter, 544 U.S. 709 ("Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."). Thus, defendants are entitled to qualified immunity for these claims.

9

b.  Religious Resources

Plaintiff asserts that Christian worshipers at Maury receive more privileges than other religious groups. Specifically, plaintiff asserts Christian inmates have access to more Christian literature, magazines, cards, calendars, bibles, and dvds, whereas Islamic inmates do not have an adequate amount of Qu'rans, Islamic Jurisprudence (laws), Hadith, dvds, tapes, calendars, prayer rugs, or kufis. Plaintiff further asserts that Christian services are held four to five days per week with Yoke fellows, guest speakers, Bible study, Christian Disciple Service, whereas Muslim services are limited to two per week. Plaintiff also seeks the provision of a Halal diet. (Compl. pp. 10, 15.)

In response, defendants again argue plaintiff failed to establish that the alleged conditions placed a substantial burden on plaintiff's ability to practice his religion. The court agrees. Plaintiff does not provide facts or evidence to establish that he was prevented from obtaining Islamic religious texts or materials from the chaplain's library at Maury or that he did not have access to religious texts while at Maury. Plaintiff additionally does not allege that he was prevented from attending Islamic services at Maury or prevented from bringing his religious texts to the Islamic services. Rather, the record reflects that plaintiff both possessed Islamic items and reading material and that plaintiff regularly attended Islamic religious services. See (Daniels Aff. ¶¶ 12, 24 and Exs. F, I.) Plaintiff further has not alleged that the twice weekly Islamic service schedule substantially burdens his practice of Islam.

The only personal deprivation plaintiff references in his filings is the absence of Islamic Jurisprudence books in the chaplain's library. Plaintiff, however, has provided no evidence whatsoever to establish that the absence of Islamic Jurisprudence books violated his religious beliefs or forced him to modify his behavior. See Krieger v. Brown, 496 F. App'x 322, 326 (4th Cir. 2012)

("Because Krieger did not show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs, the district court correctly determined that Krieger failed to establish a prima facie case under RLUIPA."); DeSimone v. Bartow, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue") (quoting Borzych v. Frank, 439 F.3d 388, 390 (7th Cir.2006)); see also, Marron v. Jabe, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n. 5 (E.D.Va. Feb. 14, 2014) (citations omitted) ("[P]laintiff asserts that without the ability to order CD's from a lawful source, he cannot learn or practice [his] religion at all and if [he] doesn't learn [his] religion [he] will be a disbeliever and [he] fear[s] nothing not even death itself except the wrath of Allah[.] Such generalized and non-specific explanations do not coherently or sufficiently articulate the existence of a substantial burden on plaintiffs religious practice.") (internal quotation omitted), aff'd, 582 F. App'x 210 (4th Cir. 2014); Muwwakkil v. Johnson, No. 7:09cv00318, 2010 WL 3585983, at *7 (W.D. Va. Sept.13, 2010) (finding the plaintiff did not demonstrate that prison officials knowingly violated his religious rights because he did not provide any religious basis on which the requested items were important to group prayer service), aff'd, 407 F. App'x 685 (4th Cir. 2011). Finally, plaintiff has not alleged any facts to support his contention that the absence of a Halal diet substantially burdened his practice of Islam.

Based upon the foregoing, plaintiff failed to establish that defendants substantially burdened his practice of Islam and plaintiff is unable to establish a RLUIPA or First Amendment violation. Thus, defendants are entitled to qualified immunity for this claim.

11

### 3. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an Equal Protection Claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. If he makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In a prison context, this level of scrutiny is "whether the disparate treatment is reasonably related to [any] legitimate penological interests." Veney, 293 F.3d at 732 (internal quotation omitted).

Beginning with plaintiff's challenge to Maury's January 16, 2013, search policy, plaintiff has not demonstrated that he was treated different from any similarly situated inmate or that the alleged different treatment was the result of purposeful discrimination. As stated, the January 16, 2013, policy provides that all inmates must be searched following chapel and provides prison administrators the discretion to conduct a strip search. (Daniels Aff. Ex. G.) In support of his equal protection claim, plaintiff submitted two grievances filed by Muslim inmates at Maury stating that Muslim and Native American inmates were strip searched on January 22, 2013, but that Christian inmates were not strip searched. (Pl.'s Resp. Ex. A, pp. 4-5.) Plaintiff, however, does not state that he, himself, was strip searched on that date. The grievances further do not state that the Christian

12

inmates were not subjected to any post-chapel search, but simply states that they were not strip searched. Finally, there is no indication in the record as to whether the inmates subject to the alleged strip searches had the same custody classification as the Christian inmates who allegedly were not subject to strip searches. Thus, plaintiff has not met his burden of demonstrating that he was treated differently from similarly situated Christian inmates.

Even assuming that plaintiff, a Muslim inmate, was treated differently from similarly situated Christian inmates for the purposes of the January 16, 2013, search policy, there is no evidence that prison officials at Maury acted with a discriminatory purpose. Rather, the record reflects that DPS enacted the challenged policy in response to multiple occurrences of inmate assaults and the facilitation of contraband movement. (Daniels Aff. ¶ 18.) Further, the policy itself contains neutral language, and states that it applies to "[a]ny inmate that leaves the housing unit for Chapel services." (Daniels Aff. Ex. G.) There is no evidence that defendants Herring, Daniels, or Wood applied this policy unequally to any religious group. To the extent any individual guard disregarded the policy or applied it inequitably, there is no evidence that defendants were aware of such conduct. Accordingly, plaintiff has not established that the alleged differing treatment was the result of purposeful discrimination.

Even if plaintiff met his burden of establishing an equal protection claim, plaintiff still is not entitled to relief because the contested policy is reasonably related to a legitimate penological interest. The policy at issue was enacted to prevent inmates from exchanging or utilizing weapons or contraband. (See Daniels Aff. ¶¶ 18-21.) The Fourth Circuit has recognized that "prison safety and security are legitimate penological interests." Veney, 293 F.3d at 732; see also Bryan v. Capers, C/A No. 8:06–cv–2515–GRA–BHH, 2007 WL 2116452, at *5 (D.S.C. July 19, 2007) (finding that

13

"the denial of the plaintiff's request for daily group prayer and access to a bathroom during the hour long weekly group prayer are rationally related to the legitimate penological interest of security"), aff'd, 252 F. App'x 546 (4th Cir. 2007). Based upon the foregoing, plaintiff fails to establish an Fourteenth Amendment violation, and defendants are entitled to qualified immunity for this claim.

The court now turns to plaintiff's equal protection claim arising out of plaintiff's contention that Christian worshipers at Maury received more privileges than Muslim worshipers. Although equal protection requires reasonable opportunities for all inmates to exercise their religious beliefs, it does not require that all religions receive identical treatment and resources. Cruz v. Beto, 405 U.S. 319, 322 n.2. (1972) ("A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty.") Instead, the Supreme Court has made clear that it is constitutionally sufficient in the prison context for prison officials to provide inmates belonging to various religions a "reasonable opportunity," consistent with valid penological concerns, to practice their religion, and that this opportunity must be "comparable" to the opportunities afforded inmates belonging to mainstream religions. Blagman v. White, 112 F. Supp.2d 534, 538 (E.D. Va. 2000) (quoting Cruz, 405 U.S. At 322)), aff'd, 3 F. App'x 23 (4th Cir. 2001).

The record reflects that there are proportionally more Christian inmates at Maury than non-Christian inmates, as well as more Christian volunteers and religious organization which donated Christian materials to Maury. (Daniels Aff. ¶ 23.) As a result, to the extent there were inequitable services or resources, the evidence reflects that such inequities were a result of the fact that there

14

were more community resources from Christian sources willing to contribute to Maury. (Id.) Further, in response to plaintiff's February 20, 2103, grievance regarding the disparity between Muslim and Christian resources in Maury's chaplain library, Wood subsequently obtained 10 additional copies of the Qu-ran for the library.[2] (Id. ¶ 11 and Ex. E.) Plaintiff, himself, possessed a Qu'ran, as well as other religious texts. (Id. ¶ 12 and Ex. F.) Moreover, on September 12, 2013, the NCDPS Regional Chaplain Services visited Maury and indicated that the chaplain's library had a sufficient amount of religious materials on hand and that the religious services at Maury were being conducted in accordance with DPS policies and procedures. (Id. ¶ 13.) Based upon the foregoing, plaintiff failed to establish that he has been denied a reasonable opportunity to exercise his religion without fear of penalty or that defendants engaged in purposeful discrimination. Thus, plaintiff failed to establish an equal protection violation. See Blagman v. White, 112 F. Supp.2d 534, 539 (E.D. Va. 2000) ("[T]he law does not require prisons to ensure that their libraries adhere to numerical parity in books congenial to various religions.") (citing Cruz, 405 U.S. at 322).

Even if defendants' alleged conduct violated plaintiff's constitutional rights, defendants are entitled to qualified immunity. As stated, defendants responded to plaintiff's grievance regarding the alleged inequities by ordering 10 additional Qu'rans. Defendants further were assured by the NCDPS Regional Chaplain Services that the chaplain's library had a sufficient amount of religious materials on hand and that the religious services at Maury were being conducted in accordance with DPS policies and procedures. Based upon the foregoing, and the fact that equal protection does not

---

[2] The February 6, 2014, inventory of the chaplain's library does not appear to include the additional Qu'rans which were allegedly ordered by defendant Wood on April 24, 2013. (Daniels Aff. Exs. D and E.) This does not effect the outcome of this case in that the February 6, 2014, log reflects several books and religious materials for Muslims. Further, plaintiff does not allege that he was denied access to a Qu-ran and his personal property log reflects that he possessed a Qu'ran while at Maury. (Id. Ex. F.)

15

mandate that equal resources be allocated identical treatment and resources, a reasonable prison official in defendants' situation would have regarded their conduct as lawful, and defendants are entitled to qualified immunity for this claim.

    4.      Fourth Amendment

Plaintiff alleges that Maury's January 16, 2013, policy implementing mandatory searches for inmates returning from chapel services violated the Fourth Amendment to the United States Constitution. The Fourth Amendment guards against unreasonable searches and seizures. U.S. Const. Amend. IV. While the Fourth Amendment applies to lawfully confined prisoners, inmates have much more limited privacy interests than those not incarcerated. Bell v. Wolfish, 441 U.S. 520, 545-46 (1979); Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981). A prison regulation that encroaches on an inmate's Fourth Amendment right "is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 85; see also, Bell, 441 U.S. at 545-46. The court must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559 (citations omitted). In cases in which an inmate asserts that a prison policy violates the Constitution, courts should defer to prison officials' expertise when determining whether a particular policy violates any constitutional provision. Id. at 547; Block v. Rutherford, 468 U.S. 576, 584-585 (1984). The burden of proof under the Turner analysis is on the inmate to disprove the validity of the prison regulation at issue. Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

As stated, the January 16, 2013, search policy was implemented to curb inmate assaults and to cease the flow of contraband facilitated through inmate chapel services. (Daniels Aff. ¶ 18.) Defendant Daniels attests in his affidavit that the search policy, which includes strip searching, is

necessary for institutional security because inmates conceal contraband on or inside their person to prevent officers from locating the contraband. (Id. ¶¶ 20, 21.) Defendant Daniels further attests that a "pat-down" search alone is insufficient because it would not effectively locate and recover contraband items such as weapons. (Id. ¶ 19.) Plaintiff has not presented any evidence refuting defendants' position. Accordingly, as set forth above, the court finds that the policy at issue in this action is reasonably related to legitimate penological interests. See Hudson v. Palmer, 468 U.S. 517, 526-527 (1984); Barbour v. Western Regional Director VDOC, No. 7:08-CV-598, 2008 WL 5062126, at *4 (W.D. Va. Nov. 28, 2008) (finding that prison officials have a security interest in ensuring that inmates housed on Icon status have no opportunity to smuggle contraband into or out of their cells), aff'd, 324 F. App'x 282 (4th Cir. May 19, 2008). Thus, plaintiff has failed to establish a constitutional violation, and defendants are entitled to qualified immunity for this claim.

To the extent plaintiff alleges that his constitutional rights were violated in the course of any particular post-chapel search, his claim fails. The Fourth Circuit Court of Appeals has recognized a limited right to bodily privacy. See Lee, 641 F.2d at 1119; Etters v. Bennett, No. 5:09-CT-3187-D, 2011 WL 976472, at *10 (E.D.N.C. Mar. 16, 2011), appeal dismissed, 444 F. App'x 686 (4th Cir. 2011). Notably, the Fourth Circuit has held that a body cavity search, which is a more intrusive search than the search in the instant action, does not violate the Fourth Amendment if it is reasonable and not motivated by punitive intent. Bushee v. Angelone, 7 F. App'x 182, 184 (4th Cir. 2001) (citing Bell, 441 U.S. at 545-46). As stated above, the search policy at issue was reasonably related the legitimate penological interest of both personal and institutional security. Although plaintiff alleges that the searches were degrading, the searches were performed in accordance with DPS policy and there is no indication in the record that any search was motivated

17

by any punitive intent. Plaintiff has not met his burden of presenting any evidence to the contrary. Accordingly, defendants are entitled to qualified immunity for this claim.

     5.     Eighth Amendment

Plaintiff alleges that the post-chapel search policy violates the Eighth Amendment. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials. " Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation omitted)). The first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was *objectively* sufficiently serious"–and the second prong is subjective–the prisoner must show that "*subjectively* the officials act[ed] with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (quotations omitted).

The court focuses its analysis on the subjective prong of the Eighth Amendment test-whether defendants acted with deliberate indifference. To meet the subjective prong, a plaintiff must show that the official acted with deliberate indifference. See, e.g., Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); Strickler, 989 F.2d at 1379. "[D]eliberate indifference entails something more than mere negligence, [but it] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Deliberate indifference "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997); see Farmer, 511 U.S. at 837; Estelle v. Gamble, 429 U.S. 97, 104–05 (1976).

Case 5:13-ct-03107-FL   Document 44   Filed 09/29/15   Page 18 of 19

As stated, the post-chapel search policy was enacted for security purposes and not punitive purposes. Plaintiff has presented no evidence to show that any defendant deliberately disregarded his constitutional rights. Thus, plaintiff has failed to establish an Eighth Amendment violation, and defendants are entitled to qualified immunity for this claim.

      6.      Retaliation

Plaintiff alleges that he was transferred from Maury in retaliation for filing this lawsuit. Plaintiff's transfer from Maury did not violate plaintiff's constitutional rights because an inmate has no constitutional right to choose his place of incarceration. See Meachum v. Fanno, 427 U.S. 215, 225 (1976); Johnson v. Ozmint, 456 F. Supp. 2d 688, 695 (D.S.C. 2006) (citing Ajaj v. Smith, 108 F. App'x 743, 744 (4th Cir. 2004)). Further, plaintiff's only factual support for his retaliation claim is his conclusory allegations that the decision to transfer plaintiff from Maury was made in retaliation for filing the instant lawsuit. Plaintiff provides no facts to suggest that the two incidents were related. These conclusory allegations of retaliation are insufficient to allege a constitutional violation. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). Thus, defendants are entitled to qualified immunity for this claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (DE 35) is GRANTED. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 29th day of September, 2015.

*/s/ Louise W. Flanagan*
LOUISE W. FLANAGAN
United States District Judge

19